# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WALTER E. RYAN, JR., individually and
on behalf of others similarly situated,

        Plaintiff,

        v.

BUCKEYE PARTNERS, L.P.,
BUCKEYE GP LLC, CLARK C. SMITH,
PIETER BAKKER, BARBARA M.
BAUMANN, BARBARA J. DUGANIER,
JOSEPH A. LASALA, JR., MARK C.
MCKINLEY, LARRY C. PAYNE,
OLIVER G. RICHARD, III, FRANK S.
SOWINSKI, MARTIN A. WHITE,
IFM INVESTORS PTY LTD,
IFM GLOBAL INFRASTRUCTURE
FUND, HERCULES INTERMEDIATE
HOLDINGS LLC,

        Defendants.

) ) ) ) ) ) ) **C.A. No. 2021-0432-JRS** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

## MEMORANDUM OPINION

Date Submitted: December 21, 2021
Date Decided: February 9, 2022

Blake A. Bennett, Esquire and Dean R. Roland, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware; Clinton A. Krislov, Esquire, Kenneth T. Goldstein, Esquire, Christopher M. Hack, Esquire of Krislov & Associates, Ltd., Chicago, Illinois; Samuel B. Edwards, Esquire and Ryan Cook Esquire of Shepherd, Smith, Edwards & Kantas, LLP, Houston, Texas, Attorneys for Plaintiff Walter E. Ryan, Jr.

William M. Lafferty, Esquire, Ryan D. Stottmann, Esquire, Sabrina M. Hendershot, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Gary A. Bornstein, Esquire and Rory A. Leraris, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendants Buckeye Partners, L.P., Buckeye GP LLC, Clark C. Smith, Pieter Bakker, Barbara M. Baumann, Barbara J. Duganier, Joseph A. LaSala, Jr., Mark C. McKinley, Larry C. Payne, Oliver G. Richard, III, Frank S. Sowinski and Martin A. White.

Jeffrey L. Moyer, Esquire, Srinivas M. Raju, Esquire and Tyler E. Cragg, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Andrew W. Hammond, Esquire and Steven A. Levy, Esquire of White & Case LLP, New York, New York, Attorneys for IFM Investors Pty Ltd, IFM Global Infrastructure Fund, and Hercules Intermediate Holdings LLC.

**SLIGHTS, Vice Chancellor**

In this putative class action, Plaintiff, Walter E. Ryan, Jr., a former unitholder of Buckeye Partners, L.P. ("Buckeye"), brings several claims of wrongdoing against both sell-side and buy-side defendants with respect to the acquisition of Buckeye by a subsidiary of IFM Global Infrastructure Fund, in which Buckeye's public unitholders received $41.50 per unit in cash consideration (the "Transaction"). The Transaction was approved by approximately 96% of Buckeye's voting unitholders.

According to Plaintiff, the defendants structured the Transaction to capture earnings and favorable tax treatment for the acquirer while avoiding paying distributions to unitholders. Plaintiff brings breach of contract, breach of the implied covenant and good faith and fair dealing (the "implied covenant") and breach of fiduciary duty claims against the sell-side defendants, as well as aiding and abetting and tortious interference with contract claims against the buy-side defendants. Defendants have now moved to dismiss all claims under Chancery Rule 12(b)(6).

For reasons explained below, the motions must be granted. The breach of contract claim fails because, contrary to Plaintiff's conclusory allegations, Buckeye's Limited Partnership Agreement ("LPA") unambiguously does not require the distribution of partnership income to members and holds Buckeye's managers to a contractual standard of conduct that Plaintiff does not well-plead has been breached. The implied covenant claim fails because Plaintiff does not identify

1

a gap in the LPA for the implied covenant to fill. The fiduciary duty claim fails because the LPA expressly disclaims traditional fiduciary duties and replaces them with a contractual standard of good faith, as is statutorily permitted in Delaware. And, as noted, Plaintiff does not well-plead a breach of the good faith standard set by the LPA.

As for Plaintiff's claims against the buy-side defendants, even if Delaware recognized a claim for aiding and abetting a breach of the implied covenant—a dubious proposition—the claim fails in any event because Plaintiff has not well-pled a predicate breach. Nor has Plaintiff come close to pleading a viable tortious interference claim.

My reasoning follows.

## I. BACKGROUND

I take the facts from Plaintiffs' Verified Class Action Complaint ("Complaint") and documents properly incorporated by reference in that pleading.[1] I accept all allegations in the Complaint, if well-pled, as true.[2]

---

[1] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (observing that "[o]n a motion to dismiss, the Court may consider documents that are 'integral' to the complaint"). When considering a Rule 12(b)(6) motion, this Court may also consider facts in public SEC filings that are not subject to reasonable dispute. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006). Indeed, many of these documents are cited in the Complaint itself. *See* Verified Class Action Compl. ("Compl.") (D.I. 1) ¶¶ 5–6.

[2] *See Largo Legacy Gp. LLC v. Charles*, 2021 WL 2692426, at *8 (Del. Ch. June 30, 2021) (noting only non-conclusory facts need be accepted as true under Rule 12(b)(6)) (citing

2

## A. The Parties

Plaintiff, Walter E. Ryan, Jr., was a unitholder of Buckeye from 2017 through the Transaction's closing on November 1, 2019.[3] He brings this putative class action suit on behalf of himself and a class of Buckeye's unitholders.[4]

Before it was acquired, Buckeye was a publicly traded limited partnership organized under the laws of Delaware and governed according to the LPA.[5] Buckeye is managed by Buckeye GP LLC ("Buckeye GP"), a Delaware limited liability company, which is governed, in turn, by a board of directors.[6] The directors on that board include Pieter Bakker, Barbara M. Baumann, Barbara J. Duganier, Joseph A. LaSala, Jr., Mark C. McKinley, Larry C. Payne, Oliver G. Richard III, Clark C. Smith, Frank S. Sowinski, and Martin A. White (together, the "Board").[7] Buckeye did not have a board of directors; it was, instead, indirectly governed by

---

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)); *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *2 (Del. Ch. Dec. 30, 2019) (same).

[3] Compl. ¶ 13.

[4] Compl. ¶ 1.

[5] Compl. ¶ 15. The Amended and Restated Agreement of Limited Partnership is attached to the Opening Br. in Supp. of the Buckeye Defs.' Mot. to Dismiss ("Buckeye OB") (D.I. 8) as Ex. A-1 ("LPA") (D.I. 9).

[6] Compl. ¶ 16; Opening Br. in Supp. of the IFM Defs.' Mot. to Dismiss the Compl. ("IFM OB") (D.I. 11) Ex. D ("Proxy") (D.I. 13) at 2.

[7] Compl. ¶¶ 1, 16–26.

3

Buckeye GP's Board.[8]  I refer to Buckeye, Buckeye GP, and the Board collectively as the "Buckeye Defendants."

Buckeye was acquired by the investment fund manager, IFM Investors Pty Ltd ("IFM"), through IFM Global Infrastructure Fund ("IFM GIF"), Hercules Intermediate Holdings LLC ("Hercules") and non-party Hercules Merger Sub LLC.[9] I refer to IFM, IFM GIF and Hercules collectively as the "IFM Defendants."

## B. The Limited Partnership Agreement

The LPA governed the relationship between Buckeye and its unitholders, including Plaintiff.[10]  Several provisions are key to this dispute and highlighted below.

*First*, the LPA provided that unitholders had no right to receive distributions. Section 4.7 provided expressly that "[n]o Partner shall be entitled . . . to receive any distributions from the Partnership except as provided in this Agreement."[11]  The provision authorizing distributions gave Buckeye GP discretion to make cash distributions if "appropriate."[12]

---

[8] Compl. ¶¶ 15–16.

[9] Compl. ¶¶ 1, 27.

[10] Compl. ¶ 15.

[11] LPA § 4.7.

[12] LPA § 5.2(a) ("From time to time, not less often than quarterly, the General Partner shall review the Partnership's accounts to determine whether distributions are appropriate.  The

4

*Second*, the LPA disclaimed fiduciary duties and replaced them with a contractual standard of good faith.[13] The LPA provided that an action is taken in "good faith" if the person taking it "believe[s] that the determination or other action is in the best interests of the Partnership."[14]

*And third*, the LPA contained a mechanism by which a conflict-of-interest transaction is evaluated at the Board level. Such transactions are "permitted and deemed approved by all Partners, and shall not constitute a breach of [the LPA] . . . or of a duty stated or implied by law or equity" so long as they are "fair and reasonable to the partnership."[15] In addition, the LPA makes clear that any resolution of a conflict of interest "shall be conclusively deemed fair and reasonable to the Partnership" if approved by "a majority of the members of the Nominating

---

General Partner *may* make such cash distributions as it may determine . . . .") (emphasis added).

[13] LPA § 7.9(c) ("Whenever the General Partner makes a determination or takes or declines to take any other action . . . , then unless another express standard is provided for in this Agreement, the General Partner shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards imposed by this Agreement, any other agreement contemplated hereby or under the Delaware [Revised Uniform Limited Partnership] Act or any other law, rule or regulation or at equity.").

[14] *Id.*

[15] LPA § 7.9(a).

and Corporate Governance Committee" of the Board, so long as the material facts of the proposed transaction were disclosed to the Board.[16]

## C. The Transaction

Between 2018 and 2019, IFM made several unsolicited offers to acquire Buckeye.[17] Following arms-length negotiations, on May 10, 2019, Buckeye announced IFM would acquire its outstanding public units for $41.50 per unit,[18] a 27.5% premium over the closing price of Buckeye units prior to the announcement of the Transaction, and a 31.9% premium over the last trading day before Buckeye announced the results of its comprehensive review of strategic alternatives.[19]

The parties subsequently entered into an Agreement and Plan of Merger (the "Merger Agreement").[20] Importantly, under the Merger Agreement, Buckeye was prohibited from making certain distributions to unitholders between signing and closing without the buyer's consent.[21] The Merger Agreement also required

---

[16] *Id.*; Buckeye OB Ex. A-2 (defining, in an amendment to the LPA, "Special Approval" as used in LPA § 7.9(a)).

[17] *See* Proxy at 36, 44, 46–48. Plaintiff does not allege that Buckeye, or any member of its Board, had a pre-existing relationship with IFM, its affiliates or any of its managers.

[18] Compl. ¶ 4. The Proxy discloses several rejected proposals from IFM before the Board accepted IFM's $41.50 per unit offer. *See* Proxy at 38, 44–48.

[19] Proxy at 52.

[20] *See* Buckeye OB at Ex. B-1 ("Merger Agreement").

[21] Merger Agreement § 5.01(b) ("[U]nless [the acquiring entity] otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), the

6

Buckeye to close five days after the closing conditions were satisfied,[22] which included obtaining certain regulatory approvals.[23] While Buckeye was contractually obligated to close at that point, IFM could delay closing until (1) five business days after the end of a "Marketing Period" to secure financing or (2) three business days after giving written notice of a delay to Buckeye.[24]

On June 7, 2019, Buckeye filed a Preliminary Proxy Statement on Form PREM14A with the Securities and Exchange Commission, followed by its Definitive Proxy Statement on Form 14A, filed on June 25, 2019 (the "Proxy").[25] The Proxy contained several disclosures pertaining to the tax consequences of the Transaction. Relevant here, the Proxy disclosed that unitholders "will be subject to U.S. federal income tax on any such allocated income and gain even if such U.S. holder does not receive a cash distribution from the Partnership attributable to such allocated income and gain."[26] It also informed unitholders that although a "gain or

---

Partnership shall not . . . (C) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any of its partnership interests or other equity or voting interests . . . .").

[22] Merger Agreement § 1.02.

[23] Merger Agreement § 6.01(b).

[24] Merger Agreement §§ 1.02, 8.12.

[25] Compl. ¶ 5.

[26] Proxy at 82.

loss recognized by a [unitholder] . . . will generally be taxable as a capital gain or loss," a "portion of this gain or loss, which portion could be substantial, will be separately computed and taxed as ordinary income or loss under [26 U.S.C. § 751]."[27] The Proxy went on to disclose that "[s]uch ordinary income attributable to unrealized receivables, inventory items and depreciation recapture may exceed net taxable gain realized upon the exchange of a Partnership Unit pursuant to the merger."[28] With these disclosures in hand, the unitholders were "strongly urged to consult [their] own tax advisor with respect to the specific tax consequences of the merger."[29]

A unitholder vote was held July 31, 2019, and unitholders overwhelmingly approved the Transaction.[30] On October 22, 2019, Buckeye announced that it had received all the necessary regulatory approvals and intended to close the Transaction on November 1, 2019.[31] Because the Transaction closed prior to the date on which the Board could consider making a distribution under the Merger Agreement,

---

[27] *Id.* at 81.

[28] *Id.* at 81–82.

[29] *Id.* at 82.

[30] Compl. ¶ 7; *see* IFM OB Ex. H (Form 8-K) at 3 (noting that over 96% of the votes cast and 93.6% of the units represented and entitled to vote were voted in favor of the transaction).

[31] Compl. ¶ 51.

8

Buckeye did not make a distribution to unitholders for the third quarter of 2019 or for the portion of the fourth quarter prior to closing.[32] The Transaction closed as planned on November 1, 2019.[33] As disclosed in the Proxy, Buckeye executives and Board members received accelerated benefits and the benefits of pre-existing severance arrangements as a result of the Transaction.[34]

Plaintiff alleges that Defendants deliberately selected the November 1 closing date to avoid paying the unitholders a distribution that was customarily declared in late October or early November, which, in turn, "maximize[d] the value transferred

---

[32] *See* Compl. ¶ 51 (quoting a Buckeye press release stating "[i]n accordance with the terms of the merger agreement, if the completion of the proporsed merger occurs on Friday, November 1, 2019 as currently expected, Buckeye's general partner would not declare or pay a cash distribution for the quarter ended September 30, 2019"); Compl. ¶ 52 ("[Buckeye's] earnings and distribution declarations for the September 30 Quarter have been always declared no later than the first week of November."); *id.* (showing the prior year's earnings and distribution declaration date as November 2); Proxy at 82 ("Under the terms of the merger agreement, the Partnership is prohibited from establishing a record date for, declaring, setting aside for payment or paying any dividend or distribution, except for regular quarterly distributions with dividend and distribution dates, as applicable, that are on the same day in the same month as for the most recent corresponding quarter prior to the consummation of the merger."); Merger Agreement § 5.01(b)(i)(C).

[33] Compl. ¶¶ 33, 75.

[34] Compl. ¶¶ 50, 93; Proxy at 74–79. According to Plaintiff, several of the individual defendants received over $50 million in accelerated and severance compensation. Compl. ¶ 50. But, as the Buckeye Defendants point out, and as the Proxy discloses, these totals include compensation given to Buckeye's executive officers who are not named as defendants in this action. Buckeye OB at 21; Proxy at 75. Nine of the ten Board members received less than $200,000 in accelerated equity awards. *Id.*

9

from the unit owners to the Buyers."[35]   He further alleges that Defendants "withh[eld] amounts due to unitholders under the Partnership Agreement, and transferr[ed] those amounts to the [IFM] Defendants."[36]

Plaintiff also takes issue with the tax consequences of the Transaction to unitholders, alleging Defendants wrongfully structured the Transaction so that millions of assets that were not distributed to the cashed-out unitholders were nonetheless taxed to them.[37]   According to Plaintiff, "the cashed-out unit owners would be taxed on not only the $41.50 merger consideration as a capital transaction, but also their unit share of the partnership's income through the closing date . . . regardless of the fact that, while the buyer will receive and retain all of that income[,] it is the cashed-out unit holders who will be taxed on, but not receive any of that income."[38]

Defendants also allegedly refused to provide Plaintiff with tax information he requested.[39]  Specifically, "[c]oncerned that Defendants may have artificially loaded

---

[35] Compl. ¶¶ 58–60.  By Plaintiff's lights, "it was a clear act of bad faith and a breach of loyalty and the Implied Covenant of Good Faith and Fair Dealing[] for the Company and the Individual Defendants to select a closing date to favor the interests of the buyer over the interests of the unitholders."  Compl. ¶ 62.

[36] Compl. ¶ 2.

[37] Compl. ¶¶ 2, 10, 33, 36.

[38] Compl. ¶ 33 (emphasis omitted).

[39] *Id.*

the Partnership with Section 751 assets to tax-benefit themselves at the redeemed unitholders' expense, Plaintiff, by counsel, repeatedly requested the Section 751 tax calculations."[40]  Defendants effectively denied the request by claiming that the calculations could only be viewed at Buckeye's Houston, Texas office, which was closed in the midst of the COVID-19 pandemic.[41]  Defendants later rejected Plaintiff's requests outright because "the redeemed-out unitholders [were] no longer partners" and, thus, were no longer entitled to inspect books and records under the LPA.[42]

**D. Procedural History**

The first litigation relating to the Transaction was styled *Ingalls v. Buckeye Partners, L.P.*, and was filed by certain unitholders in the United States District Court for the Southern District of Texas shortly after the Transaction was announced.[43]  Plaintiff intervened in *Ingalls* on September 6, 2019, and was granted Lead Plaintiff status on December 10, 2019.[44]  On January 13, 2020, Plaintiff moved to transfer the case to the United States District Court for the District of Delaware,

---

[40] Compl. ¶ 69.

[41] Compl. ¶ 70.

[42] Compl. ¶ 72.

[43] Compl. at 3; Buckeye OB Ex. I.

[44] Compl. at 3.

and that motion was granted on July 17, 2020.[45] Plaintiff's consolidated amended complaint alleged, among other things, that Defendants violated the Exchange Act by not disclosing certain tax consequences of the Transaction to unitholders (federal law claims) and breached the LPA and their fiduciary duties (state law claims), just as Plaintiff alleges here.[46]

After hearing argument on defendants' motions to dismiss, on May 5, 2021, the presiding Magistrate Judge issued a thorough Report and Recommendation (the "Report"), recommending that Plaintiff's federal claims be dismissed with prejudice but that the state law claims be dismissed without prejudice, anticipating that Plaintiff would re-file his state claims in this court.[47] The Report noted that Plaintiff had offered voluntarily to dismiss the federal claims but, nevertheless, "recommend[ed] dismissal of those claims" because "Plaintiff failed to identify an actionable false or misleading statement."[48] The presiding District Court Judge issued an order, dated June 2, 2021, adopting the Report in full.[49] In the time

---

[45] Compl. at 4; Buckeye OB at Ex. I at 10–11.

[46] Buckeye OB Ex. J at 31–35; Buckeye OB at 12.

[47] Buckeye OB Ex. M ("Report and Recommendation") at 4.

[48] Report and Recommendation at 3.

[49] *See* Buckeye OB Ex. I.

between the Report and the adoption of the Report, Plaintiff filed his Complaint in this court.[50]

The Complaint comprises four counts: (1) breach of contract against the Buckeye Defendants,[51] (2) breach of the implied covenant against the Buckeye Defendants,[52] (3) breach of fiduciary duty against the Buckeye Defendants,[53] and (4) aiding and abetting/tortious interference against the IFM Defendants.[54] In response, the Buckeye Defendants and IFM Defendants both filed Motions to Dismiss the Complaint under Court of Chancery Rule 12(b)(6).[55]

## II. ANALYSIS

Under Chancery Rule 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."[56] The standards that apply to a motion to dismiss under Rule 12(b)(6) are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences

---

[50] D.I. 1.

[51] Compl. ¶ 87.

[52] Compl. ¶ 101.

[53] Compl. ¶¶ 91–92.

[54] Compl. ¶¶ 106, 108.

[55] D.I. 7, 10.

[56] Ct. Ch. R. 12(b)(6).

in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.[57]

With respect to claims that arise from relationships based in contract, "[u]nder Rule 12(b)(6), a complaint may . . . be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations."[58]

## A. The Breach of Contract Claim

Plaintiff alleges the Buckeye Defendants breached the LPA by structuring the Transaction to benefit the IFM Defendants and "causing income items allocated to the unitholders to be [] transferred to the [IFM] Defendants."[59] The claim fails for two principal reasons.

*First*, Plaintiff's Complaint fails to cite a single provision of the LPA that the Buckeye Defendants allegedly breached. Not one. This failure is not a technical foot fault; it reflects, instead, a fundamental failure to give the Buckeye Defendants

---

[57] *Savor*, 812 A.2d at 896–97; *see also Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (holding that this court need not "blindly accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in the plaintiffs' favor") (internal quotation marks omitted).

[58] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 327 (Del. Ch. 2003).

[59] Compl. ¶ 87.

fair notice of the claim asserted against them as required by Chancery Rule 8.[60]

Indeed, the Complaint references only one section of the LPA—Section 5.1(b)[61]—

and that section deals with the calculation of unitholder capital accounts, a function

not implicated by any of Plaintiff's claims.[62]   Thus, the Complaint fails to put

Defendants on fair notice of Plaintiff's breach of contract claims.[63]

---

[60] Ct. Ch. R. 8; *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) (observing that the purpose of Rule 8 is to give the defendant "fair notice" of the claim being asserted against him); *Coca-Cola Beverages Fla. Hldgs., LLC v. Goins*, 2019 WL 2366340, at *3 (Del. Ch. June 4, 2019) (dismissing breach of contract claim under Rule 12(b)(6) for failing to identify a contractual provision that was allegedly breached); *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *5–7 (Del. Ch. June 18, 2018) (dismissing breach of contract claim because "[s]omewhat astonishingly, plaintiffs did not identify in their Complaint a specific provision in the Purchase Agreement that [defendant] allegedly breached"), *aff'd*, 202 A.3d 510 (Del. 2019).  To be clear, Plaintiff could have described the contract provision(s) allegedly breached without actually identifying them by section or subject heading, and that likely would have sufficed for notice pleading purposes. *See Cartel Media Gp. LLC v. Barone*, 2021 WL 3673215, at *3 (Del. Super. Ct. Aug. 16, 2021) ("The quoted provisions of the contract, that Defendants allege were not complied with, which contract was annexed to the counterclaim and initial complaint, are enough to put Plaintiff on notice of Defendants' claim for breach of contract.").  This Complaint did not even do that.

[61] *See* Compl. ¶ 31.  When pressed at oral argument, Plaintiff's counsel acknowledged that the Complaint makes no reference to any provision of the LPA that was breached here. Tr. of Oral Arg. on Defs.' Mots. to Dismiss ("OA Tr.") (D.I. 32) at 62:21–63:17.

[62] *See* LPA § 5.1(b) ("For purposes of computing the amount of each item of income, gain, loss or deduction to be reflected in the Capital Accounts, the determination, recognition and classification of such item shall be the same as its determination, recognition and classification for federal income tax purposes . . . .").

[63] *See, e.g.*, *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) ("An allegation, though vague or lacking in detail[,] can still be well-pleaded *so long as it puts the opposing party on notice of the claim brought against it*.") (emphasis added) (internal quotation marks omitted).

15

*Second*, when one actually reads the LPA, Plaintiff's pleading strategy to avoid specific reference to the contract is not surprising. Instead of supporting Plaintiff's breach of contract claim, the provisions of the LPA actually foreclose it. The LPA makes clear that Plaintiff and other Buckeye unitholders were not entitled to distributions as a matter of right; indeed, Section 5.2(a) underscores the General Partner's discretion in deciding whether and when to make distributions to unitholders, stating that "[t]he General Partner *may* make such cash distributions *as it may determine*."[64]  And Section 4.7 is even more clear: "No Partner shall be entitled to withdraw any part of its Capital Contributions or its Capital Account or *to receive any distributions* from the Partnership except as provided in this Agreement."[65] That Buckeye historically paid quarterly distributions does not create a contractual right to receive them.

To summarize, the breach of contract claim must be dismissed because Plaintiff does not even attempt to plead the claim and, even if he had, the LPA makes clear the claim cannot be squared with the unambiguous terms of the operative contract.[66] To the extent Plaintiff would couch his allegation that the Buckeye

---

[64] LPA § 5.2(a) (emphasis added).

[65] LPA § 4.7 (emphasis added).

[66] The Buckeye Defendants argue that the breach of contract claim also fails as a matter of law because only Buckeye GP LLC is a party to the LPA. *See* Buckeye OB at 15–16;

16

Defendants have acted in bad faith as a breach of contract claim, I address that claim below.

## B. Breach of the Implied Covenant

Plaintiff's allegations in support of his implied covenant claim, like his breach of contract allegations, are sparse. In essence, in a single paragraph, Plaintiff alleges the Buckeye Defendants breached the implied covenant by engaging in the conduct that allegedly breached the LPA.[67] For reasons explained below, the claim, as pled, fails.

"The implied covenant is inherent in all contracts" and ensures parties do not "frustrat[e] the fruits of the bargain" by acting "arbitrarily or unreasonably."[68] The application of the implied covenant of good faith and fair dealing, however, is limited to filling contractual gaps that neither party anticipated.[69] For this reason,

---

Reply Br. in Further Supp. of the Buckeye Defs.' Mot. to Dismiss (D.I. 24) at 3. I need not consider this argument, as dismissal is justified on other grounds.

[67] Compl. ¶ 101 ("Defendants' conduct described above violates the Covenant of Good Faith and Fair Dealing implied in all contracts.").

[68] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017).

[69] *Id.*; *Nemec*, 991 A.2d at 1125; *see also Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) ("[T]he court has in its toolbox the implied covenant of good faith and fair dealing to fill in the spaces between the written words."); *Lidya Hldgs. Inc. v. Eksin*, 2022 WL 274679, at *6 (Del. Ch. Jan. 31, 2022) (noting the implied covenant "should not be deployed when 'there is no gap to fill in the Agreement'") (citing *Glaxo Gp. Ltd.*, 248 A.3d at 920) (alterations omitted); *Miller v. HCP & Co.*, 2018 WL 656378, at *9 (Del. Ch. Feb. 1, 2018) (noting that the implied covenant, as applied, "must be consistent with the

17

the implied covenant is "rarely invoked successfully,"[70] as it is "a limited and extraordinary legal remedy."[71]

Given these well-settled principles, the Buckeye Defendants correctly point out that the implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue."[72]  Here, the LPA fully occupies the spaces where Plaintiff would have the Court shoehorn the implied covenant.[73]

*First*, Ryan alleges that the Buckeye Defendants breached the implied covenant by "withholding amounts due the unitholders under the [LPA], and transferring those amounts to the [IFM] Defendants."[74]  But as noted, the LPA, by its terms, makes clear that Plaintiff was not *entitled* to any distributions at all.

---

terms of the agreement as a whole") (citing *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009)).

[70] *Miller*, 2018 WL 656378, at *9 (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)).

[71] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec*, 991 A.2d at 1128).

[72] OBB at 24; *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014).

[73] As noted, the Complaint is not at all clear on what factual allegations fit under the umbrella of the implied covenant.  *See* Compl. ¶¶ 99–104.  Consequently, I do my best to construct Plaintiff's best implied covenant claim by doing what he should have done—pulling factual allegations from elsewhere in the Complaint and inserting them within the implied covenant count.

[74] Compl. ¶ 2.

*Second*, Plaintiff alleges the Buckeye Defendants wrongfully chose to close on November 1, 2019, "to maximize the value transferred from the unit owners to the Buyers."[75] As a preliminary matter, the timing of the closing as relates to distributions is a moot point since Plaintiff was not entitled to distributions. But, in any event, the Buckeye Defendants were contractually obligated to close "on the fifth business day following the satisfaction or waiver" of all closing conditions, including governmental regulatory approvals.[76] While the IFM Defendants could delay closing in certain circumstances, once closing conditions were satisfied, the Buckeye Defendants enjoyed no such freedom to delay. Importantly, Plaintiff does not allege that the timing of regulatory approvals was within the Buckeye Defendants' control such that they could manipulate the closing date.

According to Plaintiff, the Merger Agreement provided that distributions could be made if the acquiror consented, and that "such consent [was] not to be unreasonably withheld."[77] But Plaintiff fails to explain why IFM would have consented to a distribution when the distribution would be to its financial detriment, and he fails to allege how a refusal to give consent under such circumstances would have been "unreasonabl[e]." Again, he does not even try.

---

[75] Compl. ¶ 60.

[76] Merger Agreement § 1.02.

[77] Merger Agreement § 5.01(b).

19

*Third*, Plaintiff alleges that Buckeye rejected his requests for additional information about the calculation of Section 751 income reported on his personal Form K-1.  Here again, the LPA expressly addresses unitholders' information rights; there is, therefore, no room for the implied covenant to work here.[78]  And, as the Buckeye Defendants point out, "at the time Ryan first made his request for information in March 2020, the Transaction had already closed and Ryan had ceased to be a unitholder—meaning he had no further information rights under the LPA, express *or* implied."[79]

In sum, Plaintiff fails to plead a gap in the LPA that could be filled by the implied covenant.  The claim for breach of the implied covenant, therefore, fails as a matter of law.

## C. Breach of Fiduciary Duty

Plaintiff asserts the Buckeye Defendants breached their fiduciary duties by foisting the Transaction on Buckeye unitholders on unfair terms.  Of course, the claim assumes the Buckeye Defendants owed fiduciary duties.  As explained below,

---

[78] *See* LPA § 8.5; Buckeye OB at 27.

[79] Buckeye OB at 27; *see also Greenhouse v. Polychain Fund I LP*, 2019 WL 2290245, at *4–5 (Del. Ch. May 29, 2019) (holding that plaintiff had no standing to seek books and records under 6 *Del. C.* § 17-305 because plaintiff was no longer a limited partner). In *Greenhouse*, the Court noted that "[c]entral to the statute is the refrain that the inspection right belongs to current limited partners."  *Id.* at *4.  The LPA likewise provides information rights only to "Limited Partner[s]."  LPA § 8.5.

they did not. And, to the extent the fiduciary duty claim rests on a breach of the standard of conduct prescribed in the LPA, the pled facts fall well short of supporting a reasonable inference that the contractual standard was breached.

## 1. The LPA Eliminated Traditional Fiduciary Duties

Under Delaware law, alternative entities such as limited partnerships are "creatures of contract."[80] By statute, our General Assembly has declared that "[i]t is the policy of [Delaware] to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[81] To that end, traditional fiduciary duties "may be expanded or restricted or *eliminated* by provisions in the partnership agreement," except for the implied covenant.[82]

That is precisely what the LPA did. Section 7.9(c) declares that the General Partner "shall not be subject to any other or different standards imposed by this Agreement, any other agreement contemplated hereby or under the Delaware

---

[80] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016).

[81] 6 *Del. C.* § 17-1101(c); *Dieckman*, 155 A.3d at 366 ("The Delaware Revised Uniform Limited Partnership Act ('DRUPLA') gives 'maximum effect to the principle of freedom of contract.'") (citing 6 *Del. C.* §17-1101(c)).

[82] 6 *Del. C.* § 17-1101(d) (emphasis added); *Dieckman*, 155 A.3d at 366 ("The act allows drafters of Delaware limited partnerships to modify or eliminate fiduciary-based principles of governance, and displace them with contractual terms."); *In re Inergy L.P. Unitholder Litig.*, 2010 WL 4273197, at *12 (Del. Ch. Oct. 29, 2010) ("§ 1101(d) allows MLPs to eliminate completely a general partner's fiduciary duties to common unitholders, subject only to the limited protections of the covenant of good faith and fair dealing.").

21

[Revised Uniform Limited Partnership] Act or any other law, rule or regulation or at equity."[83] This language displaced traditional fiduciary duties,[84] and precludes Plaintiff from prosecuting a claim based on a breach of common law fiduciary duties.[85]

### 2. Even if Fiduciary Duties Existed, the Business Judgment Rule Applies Under *Corwin*

The Buckeye Defendants argue that even if traditional fiduciary duties had not been displaced by the LPA, the fiduciary duty claim would still fail because their actions would be protected by the business judgment rule under *Corwin*.[86] I agree.[87] Under *Corwin*, "the business judgment rule is invoked as the appropriate standard

---

[83] LPA § 7.9(c).

[84] *See, e.g.*, *Brinckerhoff v. Texas Eastern Prods. Pipeline Co., LLC*, 986 A.2d 370, 389 (Del. Ch. 2010) (finding that a similar provision in a limited partnership agreement was "an 'express standard' that replaces default fiduciary rules"). Plaintiff disputes that this language waives fiduciary duties, but he does not offer *any* competing interpretation, much less a reasonable one. Answering Br. in Opp'n to Defs.' Mots. to Dismiss Pl.'s Compl. ("PAB") (D.I. 23) at 17.

[85] *See Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 252–53 (Del. 2017), *as revised* (Mar. 28, 2017) ("If fiduciary duties have been validly disclaimed, the limited partners cannot rely on traditional fiduciary principles to regulate the general partner's conduct. Instead, they must look exclusively to the LPA's complex provisions to understand their rights and remedies.").

[86] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[87] Plaintiff does not argue that *Corwin* does not apply in the limited partnership context, so in this case, I assume that it does. After all, *Corwin* itself involved a merger between a limited partnership and a limited liability company. *Id.* at 306 n.3. While there may be reasons to restrict or alter *Corwin*'s application in the alternative entity context, the parties have not identified them and I see no reason to search for them here.

of review for a post-closing damages action when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[88] The business judgment rule "precludes judicial second-guessing so long as the [] decision 'can be attributed to any rational business purpose.'"[89] "When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result."[90] Having failed to plead waste—which is not at all surprising given the hefty premium secured in the Transaction—dismissal is the result here as well.

Plaintiff argues *Corwin* does not apply because the vote was not fully informed.[91] He maintains that Buckeye "failed to disclose the material details about the consequences of the closing," particularly "the tax consequences to cashed-out unitholders."[92] Again, I disagree. As a preliminary note, the District Court already

---

[88] *Id.* at 305–06.

[89] *In re MFW S'holders Litig.*, 67 A.3d 496, 526 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[90] *Singh v. Attenborough*, 137 A.2d 151, 152 (Del. 2016) (observing that dismissal will likely result "because the vestigial waste exception has long had little real-world relevance" since "it has been understood that stockholders would be unlikely to approve a transaction that is wasteful").

[91] *Corwin*, 125 A.3d at 312 ("[T]he doctrine applies only to fully informed, uncoerced stockholder votes, and if troubling facts . . . were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked.").

[92] PAB at 19.

addressed and dismissed these challenges to the Proxy disclosures in the prior federal

action not only because Plaintiff abandoned them,[93] but also because he "failed to

identify an actionable false or misleading statement."[94] The federal court's ruling,

if not outright preclusive,[95] is, at a minimum, highly persuasive.

In any event, the Buckeye Defendants point to several disclosures in the Proxy

that reveal the unitholder vote was fully informed.[96] The disclosures reflect that

---

[93] According to Plaintiff, his election to abandon his federal disclosure claims was a "strategic decision." *Id.*

[94] Report and Recommendation at 3.

[95] The Buckeye Defendants argue that the District Court's ruling is preclusive as a matter of collateral estoppel. *See* Buckeye OB at 33–34 ("The federal judgment bars Ryan from relitigating claims related to allegedly inadequate disclosures as a matter of issue preclusion."). At oral argument, Plaintiff agreed that the District Court's ruling is a final "binding final judgment for issue and claim preclusion purposes" regarding the federal claims, but he argued it did not affect the state causes of action. *See* OA Tr. 54:1–24. Because I do not rest my finding here on collateral estoppel, I need not decide this issue.

[96] *See* Buckeye OB at 8–9, 34–35; *see, e.g.*, Proxy at 81 ("[A] portion of [the] gain or loss, which portion could be substantial, will be separately computed and taxed as ordinary income or loss under Section 751 of the Code to the extent attributable to 'unrealized receivables' or to 'inventory items' owned by the Partnership in its subsidiaries."); *id.* at 81–82 ("Such ordinary income attributable to unrealized receivables, inventory items and depreciation recapture may exceed net taxable gain realized upon the exchange of a Partnership Unit pursuant to the merger . . . ."); *id.* at 81 ("The amount of gain or loss recognized by each U.S. holder in the merger will vary depending on each U.S. holder's particular situation . . . ."). I note that "there is no obligation to supply investors with legal advice," nor is there an obligation to supply definitive tax advice, particularly when the disclosure encourages unitholders to seek out advice from their own tax advisors. *Kahn v. Caporella*, 1994 WL 89016, at *7 (Del. Ch. Mar. 10, 1994); *see* Proxy at 82 ("Each U.S. holder is strongly urged to consult its own tax advisor with respect to the specific tax consequences of the merger to such holder, taking into account its own particular circumstances.").

Buckeye unitholders were told that the Transaction could carry adverse tax consequences for them, received a summary of those potential consequences, and were advised to consult with their own tax advisors before casting their vote. This is more than adequate to fulfill the Board's disclosure obligation.[97]

While not clear, it appears Plaintiff may be arguing that *Corwin* is not applicable because entire fairness is the applicable standard of review given that all members of the Board were conflicted.[98] They were not. The only basis for conflict Plaintiff offers is that Board members received accelerated equity awards and pre-existing severance payments that were triggered by the Transaction. But, under Delaware law, "the possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law,"[99] especially when "the interests of the [unitholders] and directors are

---

[97] *See Caporella*, 1994 WL 89016, at *7; *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *32 (Del. Ch. May 25, 2021) (finding on a motion to dismiss that a disclosure urging stockholders to consult with advisors regarding the scope of their appraisal rights was adequate).

[98] PAB at 18 ("The Buckeye Defendants' self-interested dealings trigger the entire fairness standard of review."). I note that this allegation, alone, is not sufficient to take the Transaction out of the *Corwin* paradigm. *See In re Merge Healthcare Inc.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017) (explaining that *Corwin* applies in the context of allegations that entire fairness is triggered by a conflicted board). As I explain below, however, even if a conflicted board was, alone, sufficient to disable *Corwin*, the allegations of conflict in this Complaint are not well pled.

[99] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013).

aligned in obtaining the highest price" for the company.[100] Nor has Plaintiff alleged that director compensation was "material to the director," as required to "create independence problems."[101]

Regardless, the LPA provided that any resolution of a purported conflict of interest "shall be conclusively deemed fair and reasonable to the Partnership" if "approved by Special Approval," meaning "approval by a majority of the members of the Nominating and Corporate Governance Committee" of the Board, "as long as the material facts known to the officers and directors of the General Partner . . . were disclosed."[102] The Nominating and Corporate Governance Committee unanimously approved the Transaction,[103] and there is no allegation they did not know the material facts relating to the deal before doing so. Therefore, under the LPA, the Transaction is deemed conclusively fair and reasonable, extinguishing any claim of conflict.[104]

---

[100] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007).

[101] *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010).

[102] LPA § 7.9(a); Buckeye OB Ex. A-2.

[103] Proxy at 3.

[104] *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 110 (Del. 2013) ("[T]he Conflicts Committee's grant of Special Approval requires us to conclude that Allen's allegations fail to state a claim . . . .").

26

### 3. The Complaint Does Not Well Plead a Lack of Good Faith

According to the Complaint, "[a]ny attempt to disclaim or avoid common law fiduciary duties fails due to Defendants' self-dealing. Further, the Partnership Agreement did not unambiguously disclaim liability for the type of bad faith, disloyal conduct at issue."[105] As explained below, these allegations fail as a matter of law and as a matter of pleading on several fronts.

As a preliminary matter, Plaintiff's allegations regarding the Transaction have no bearing on whether the LPA eliminated traditional fiduciary duties (which it unambiguously did). That disclaimer occurred on a clear day years before the Transaction presented on the horizon. Additionally, the LPA did not attempt to "disclaim liability for . . . bad faith," as Plaintiff alleges, but instead imposed a contractual duty of good faith. An action is taken in "good faith" under the LPA if the person taking it believes it to be "in the best interests of the Partnership."[106] Plaintiff failed even to mention (or cite to) this contractual standard in his Complaint, but more importantly, he has not well-pled that Defendants did not believe the Transaction was in the best interests of Buckeye and its unitholders.

---

[105] Compl. ¶ 94.

[106] LPA § 7.9(c).

The well-pled allegation of bad faith "is a [rare bird]."[107] A conclusory incantation of the words "bad faith" is not enough; the plaintiff must, instead, offer a factual narrative that provides at least some explanation of the motive of the supposed bad faith actor.[108] The Complaint *sub judice* makes no such effort. In other words, Plaintiff pleads no facts that would allow a reasonable inference that the Buckeye Defendants believed the Transaction was not "in the best interests of the Partnership" but nevertheless caused Buckeye to commit to it.

The only reasonable inference from the facts as pled (and properly incorporated documents to the Complaint) is that IFM wanted to acquire Buckeye, the Board initially rebuffed offers it considered too low, the Buckeye Defendants ultimately secured a substantial premium for the unitholders, and one of the terms in the Merger Agreement Buckeye offered to achieve that premium included a restriction on issuing distributions that, while regularly declared, the unitholders had

[107] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016); *see also Genworth Fin., Inc. Consol. Deriv. Litig.*, 2021 WL 4452338, at *1 (Del. Ch. Sept. 29, 2021) ("In Delaware, the sustainable bad faith claim is a 'rara avis.'") (quoting *Chelsea*).

[108] *See, e.g.*, *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *12 (Del. Ch. Dec. 30, 2019) (finding that "the conclusory suggestion[s]" proffered in the complaint "lack[ed] any factual narrative that would allow any inferential explanation of why the[] fiduciaries would so abandon their duties as to engage in bad faith"); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("General allegations of bad faith are not sufficient.").

no contractual right to receive.[109] This narrative does not come close to supporting

a reasonable inference that the Buckeye Defendants engaged in bad faith, as

understood in our common law, or failed to act in good faith, as defined in the LPA.

This is especially so when one appreciates that the individual Buckeye Defendants

were themselves unitholders with an incentive to obtain the highest price possible

for all unitholders on the best terms available, understanding that their units would

be subject to the same tax treatment as the others.[110]

---

[109] *See* Proxy at 36, 44, 46–48; Compl. ¶¶ 1, 4, 35, 46, 51.

[110] *Cf. Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002) ("A director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders . . . as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."); *In re Mindbody, Inc.*, 2020 WL 5870084, at *14 (Del. Ch. Oct. 2, 2020) ("It is a guiding principle of Delaware law that material amounts of stock ownership can serve to align the interests of fiduciaries with the interests of other stockholders."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012) (noting the "basic understanding that when a stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned").

At oral argument, Plaintiff's counsel proffered the acceleration of deferred compensation and the triggering of severance benefits for the individuals that are part of the Buckeye Defendant group as evidence of bad faith, and then pointed to this court's decision in "*Skye Mineral*" to argue that this alone is enough to support an inference of bad faith. *See* OA Tr. at 45:1–46:13. I note there are actually two decisions in *Skye Mineral* and both address allegations of bad faith. *See Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *27 (Del. Ch. Feb. 24, 2020) ("*Skye I*"); *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2021 WL 3184591, at *16 (Del. Ch. July 28, 2021) (*Skye II*). Plaintiff's counsel did not clarify which of the decisions he was relying upon. *See* OA Tr. at 46:1. Regardless, neither opinion supports Plaintiff's argument. In *Skye I*, the court held, in part, that the plaintiffs pled sufficient facts to support an inference that defendants exercised certain contractual blocking rights in bad faith, intending for the company to suffer so that they could purchase the company's assets for themselves at a bargain price. *See Skye I*, at *27. Later in the litigation, this court reached a similar

\* \* \* \* \*

The breach of fiduciary duty claim must be dismissed because the LPA disclaims fiduciary duties, the fully informed unitholder vote cleanses any fiduciary duty breach and the Complaint fails to well-plead that the Buckeye Defendants breached their contractual obligation to act in good faith.

## D. Aiding and Abetting and Tortious Interference with Contract

In its final claim, Plaintiff alleges the IFM Defendants aided and abetted in the Buckeye Defendants' breaches of contract, the implied covenant and fiduciary duties, as well as tortiously interfered with the LPA.[111] As for the aiding and abetting count, the IFM Defendants correctly observe that, generally speaking, "Delaware does not recognize a claim for aiding and abetting a breach of contract."[112] The same

---

holding—this time as to the allegations in the counterclaims. *See Skye II*, at \*16 (holding that facts supported an inference that directors acted in bad faith by "exploit[ing] their control" over the company "in an effort to put [the company] back in default under [a] loan, for the *sole* purpose of enriching themselves to the detriment of SMP and CSM"). Plaintiff has pled nothing approximating those facts here. *See Novell*, 2013 WL 322560, at \*11 ("[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law.").

[111] Compl. ¶¶ 6, 106.

[112] IFM OB at 14 (citing *Wenske, v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at \*15 n.128 (Del. Ch. July 6, 2018)); *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at \*11 (Del. Ch. Jan. 18, 2013) (same). I note, as do the IFM Defendants, that this court has recognized a limited exception to this rule when a contract creates fiduciary duties. *See Dieckman v. Regency GP LP*, 2018 WL 1006558, at \*4 (Del. Ch. Feb. 20, 2018) ("Delaware law does not recognize a claim for aiding and abetting a breach of contract. An exception to this rule arises where a contract creates fiduciary duties, but that exception does not apply here.") (internal quotation marks and footnotes omitted). Just as in

30

is true with respect to claims for aiding and abetting a breach of the implied covenant.[113] Because Plaintiff fails to plead a cognizable claim under Delaware law, the aiding and abetting breach of contract and the implied covenant claims must be dismissed.[114]

Even if these claims were viable under Delaware law, the claims would still fail because, as explained above, the Buckeye Defendants did not actually breach the LPA or the implied covenant. The IFM Defendants could not have aided and abetted the Buckeye Defendants in breaches that never occurred.[115]

---

*Dieckman*, this exception does not apply here because, as noted, the LPA supplanted fiduciary duties with a contractual standard of good faith.

[113] *See Gerber*, 2013 WL 209658, at *11 ("Delaware law does not recognize a claim for aiding and abetting a breach of contract. Accordingly, [plaintiff's] claims—if they are asserted—for aiding and abetting a breach of the LPA, *or a covenant implied through the LPA*, must also fail.") (emphasis added) (footnote omitted).

[114] *See Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001) ("The plaintiffs are entitled to all reasonable inferences flowing from their pleadings, but if those inferences do not support a valid legal claim, the complaint should be dismissed . . . ."); *see also Allen*, 113 A.3d at 194 ("When parties establish a purely contractual relationship, they have chosen to limit themselves to pursuing contractual remedies against their contractual counterparties. Under those circumstances, a claim for aiding and abetting cannot be used to expand the possible range of defendants.").

[115] *See, e.g.*, *English v. Narang*, 2019 WL 1300855, at *14–15 (Del. Ch. Mar. 20, 2019) ("'As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.' Here, because plaintiffs' breach of fiduciary duty claim fails to state a claim for relief against the individual defendants for the reasons explained above, the aiding and abetting claim fails as well for lack of a predicate breach of duty.") (citing *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011)).

The same is true for the claim that the IFM Defendants aided and abetted in the Buckeye Defendants' breach of fiduciary duty. To state a claim for aiding and abetting a breach of fiduciary duty, Plaintiff must allege: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and nonfiduciary.[116] Since there is no predicate fiduciary duty, much less a breach of fiduciary duty, this claim also fails.[117]

But even assuming fiduciary duties existed and applied, Plaintiff's claim *still* fails because Plaintiff's allegations and the documents properly incorporated by reference do not allow an inference that the IFM Defendants knowingly participated in a breach. Allegations that the IFM Defendants "knew or should have known" of the fiduciary breaches through their "involvement in the negotiations" and "material aid" and "willingness"[118] to consummate the deal fall well short of meeting the

---

[116] *Malpiede*, 780 A.2d at 1096.

[117] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *27 (Del. Ch. Oct. 24, 2014) ("Because the underlying breaches of fiduciary duty are being dismissed, Plaintiffs' aiding and abetting claim must be dismissed as well."); *Gerber*, 2013 WL 209658, at *11 ("Gerber has not stated a claim for breach of fiduciary duty. Accordingly, his claim for aiding and abetting a breach of fiduciary duty must also fail.").

[118] Compl. ¶¶ 107–08.

"stringent standard" applicable to allegations of "knowing participation."[119] Rather, the only reasonable inference to be drawn from the Complaint is that the IFM Defendants paid a high premium after substantial arms-length negotiations and, in exchange, bargained for certain contractual provisions that operated in their favor. "This Court adheres to 'the long-standing rule that arm's-length bargaining . . . does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting.'"[120] As Vice Chancellor Zurn recently observed, "[c]onsistent with longstanding principles of law and capitalism," a buyer can "exercise[] its right to secure for itself a sweet deal."[121]

Plaintiff's tortious interference claim against the IFM Defendants fares no better. To state a claim for tortious interference with contract, a plaintiff must adequately allege: "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[122] The third element is not met

---

[119] *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014).

[120] *Jacobs v. Meghji*, 2020 WL 5951410, at *8 (Del. Ch. Oct. 8, 2020) (citing *Morgan v. Cash*, 2010 WL 2803746, at *1 (Del. Ch. July 16, 2010)).

[121] *Id.* at *13 (internal quotation marks omitted).

[122] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266 (Del. 2004) (internal quotation marks omitted).

because, as explained above, Plaintiff fails to well-plead that the Buckeye Defendants breached the LPA.[123]

The tortious interference claim also fails because Plaintiff has not pled that the IFM Defendants acted "without justification." This element is distinct from "knowing participation" as an element of aiding and abetting. In aiding and abetting claims, a third-party knows the counterparty has fiduciary obligations and helps participate in that counterparty's breach of those obligations.[124] If the fiduciary obligation does not exist, the other party may negotiate at arms-length for its own financial benefit with no concern for the extent to which the contract might be detrimental to the counter-party.[125] Here, the only reasonable inference from the

---

[123] *See Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 713 (Del. Ch. 2004) (holding that a tortious interference claim "necessarily fails" because plaintiff "failed to state a claim" for breach of contract or of the implied covenant), *aff'd*, 861 A.2d 1251 (Del. 2004); *see also Goldman v. Pogo.com Inc.*, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002) ("A claim of tortious interference with a contractual right requires, *inter alia*, a contract, *a breach of that contract*, and an injury.") (emphasis added).

[124] *Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third-party act with the knowledge that the conduct advocated or assisted constitutes such a breach.")

[125] *See, e.g.*, *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *12 (Del. Super. Ct. Nov. 2, 2011) ("It was not improper for defendants to interfere with the . . . [a]greements in order to protect their own financial interest . . . ."), *aff'd*, 49 A.3d 1168, 1174 (Del. 2012) (affirming the trial court's determination that protecting one's own financial interest "weighed in favor of justification"); *Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *8 (Del. Super. Ct. Jan. 13, 2021) (observing that, for a tortious interference claim, "the complaint must allege facts" that the "interference was unjustified—a meddling motivated not by legitimate economic goals, but with bad faith").

Complaint is that the IFM Defendants thought the Transaction was in their best interests and pursued it accordingly. That does not support a claim for tortious interference.

### E. The Complaint is Dismissed with Prejudice

In his answering brief, Plaintiff asks that he be given leave to amend his Complaint. But he chose to brief the motion to dismiss instead of filing an amended complaint, as permitted by Chancery Rule 15(a). The consequence of this choice under our rules is that if "the Court . . . concludes that the Complaint should be dismissed . . . such dismissal shall be with prejudice."[126]

Chancery Rule 15(aaa) allows the Court to depart from this general rule and dismiss a complaint without prejudice for "good cause shown."[127] Though he has not couched his argument in terms of "good cause," Plaintiff essentially argues that dismissal with prejudice is unjustified because he "has repeatedly demanded information and records from Defendants to which he is rightfully entitled."[128] In other words, Plaintiff argues this Court should dismiss his Complaint without prejudice because any insufficiencies in his allegations are the fault of Defendants.[129]

---

[126] Ct. Ch. R. 15(aaa).

[127] *Id.*

[128] PAB at 32.

[129] *Id.* at 34 ("To the extent the Court finds that Plaintiff's Complaint lacks sufficient specificity, the Court should order Defendants to produce the information and records

35

Plaintiff's argument in this regard is unpersuasive. As a threshold matter, because Plaintiff is no longer a unitholder, he does not have standing to enforce information rights under the LPA.[130] I do not see "good cause" to amend based on inspection rights that Plaintiff no longer has standing to enforce.

More importantly, Plaintiff's claims do not fail for a lack of specificity that more information in-hand could fix. The breach of contract claim fails because the Buckeye Defendants were under no contractual obligation to make distributions. The implied covenant claim fails because the LPA specifically addresses the issues that animate Plaintiff's claims, such that there are no gaps to fill. The fiduciary duty claim fails because the LPA expressly removed traditional fiduciary duties and there is no reasonably conceivable basis to conclude that the Buckeye Defendants failed to act in good faith. And the claims against the IFM Defendants fail because there is no predicate breach of contract or fiduciary duty. These fundamental defects in Plaintiff's claims flow from a clear and unambiguous contract, a contract that Plaintiff did not even attempt to reconcile with his claims, not just from his thread-

---

(which Plaintiff has requested and is entitled to) and permit Plaintiff to replead with such information in hand.").

[130] *Greenhouse v. Polychain Fund I LP*, 2019 WL 2290245, at *4–5 (Del. Ch. May 29, 2019) (holding that plaintiff had no standing to seek books and records under 6 *Del. C.* § 17-305 because plaintiff was no longer a limited partner).

bare factual allegations. Amendment would be futile.[131] Therefore, not only has Plaintiff failed to show the "good cause" required under Chancery Rule 15(aaa) for this Court to overlook his strategic decision to brief a motion to dismiss rather than amend his Complaint, he has also failed to demonstrate why leave to amend would not be futile. Dismissal is with prejudice.

### III. CONCLUSION

Based on the foregoing, the Buckeye Defendants' and the IFM Defendants' Motions to Dismiss are GRANTED.

**IT IS SO ORDERED.**

---

[131] *See Clark v. State Farm Mut. Auto. Ins. Co.*, 131 A.3d 806, 811–12 (Del. 2006) ("A motion for leave to amend a complaint is futile where the amended complaint would be subject to dismissal under Rule 12(b)(6) for failure to state a claim.") (internal quotation marks and citation omitted). I note that Plaintiff has not explained how he would obtain the records he says he needs to plead a better complaint. He has not brought an action to compel inspection of books and records, likely because he appreciates he has no standing to bring that claim. And he cannot obtain litigation discovery for the sake of enabling him to plead a claim he cannot otherwise well-plead. *See Zhang v. Zoox, Inc.*, — A.3d —, 2022 WL 275777, at *7 (Del. Ch. Jan. 31, 2022) (observing that it is a "well-established principle of Delaware law that a litigant is not entitled to conduct discovery for the purpose of developing new causes of action").